600 So.2d 97 (1992)
Jackie D. HUCKABAY, et ux., Plaintiffs-Appellees,
v.
Paul R. KEAHEY, Jr., Defendant-Appellant.
Billy Ray ELLIOTT, et ux., Plaintiffs-Appellees,
v.
Paul R. KEAHEY, Jr., Defendant-Appellant.
Nos. 23593-CA, 23594-CA.
Court of Appeal of Louisiana, Second Circuit.
May 13, 1992.
Rehearing Denied June 18, 1992.
*98 Bethard & Davis by James G. Bethard, Coushatta, for defendant-appellant.
Egan & Cook by William H. Cook, Jr., Shreveport, for plaintiffs-appellees.
Before NORRIS, LINDSAY and VICTORY, JJ.
NORRIS, Judge.
Plaintiffs in these consolidated cases are Billy Ray and Edwena Ray Elliott, and Jackie D. and Patricia Goff Huckabay. They seek to recover the proceeds of two drafts issued to them by defendant Paul Keahey in payment for mineral deeds. Keahey refused to honor the drafts, claiming that plaintiffs' titles were not merchantable. He now appeals judgments in the plaintiffs' favor. We reverse and render.

FACTS
The Huckabays and the Elliotts own separate tracts of land in Red River Parish. They granted mineral leases on the tracts in the early 1980's; gas-producing wells were subsequently drilled. In 1986, Bayou Exploration became the operator of both wells. The record indicates there was little production, however, and the wells sat unattended for some time.
In 1989, Keahey, whose experience in the oil and gas business is considerable, learned of the Huckabay and Elliott wells from A.G. Murphy and his son. The Murphys, who were not called to testify, told Keahey that they understood both leases had expired and that the ownership of the equipment at the well sites had reverted to the plaintiffs as landowners. Before contacting the plaintiffs, Keahey visited the well sites to ensure that the wells were fully equipped. Photographs introduced at trial show signs identifying Bayou Exploration as the operator and warning about hydrogen sulphide gas. Keahey also reviewed the well log for each well and the well files at the Department of Conservation; he went to the conveyance records in Red River Parish to get a description of the property involved.
After his investigation, Keahey approached Huckabay and Elliott. Huckabay referred Keahey to his attorney. The Huckabays ultimately signed a mineral deed that conveyed their mineral interest to *99 Keahey but excluded any warranty on the equipment located on site.[1] In exchange for this deed, Keahey signed a royalty deed giving the Huckabays a 25% royalty interest (the same percentage they had enjoyed under the earlier mineral lease), and gave them a draft for $10,000. Shortly thereafter, the Elliotts signed a mineral deed prepared by Keahey.[2] In return, Keahey gave the Elliotts a 25% royalty interest and a draft for $10,000. The parties stipulated that during the course of negotiations, neither Elliott nor Huckabay made any representation to Keahey about the status of the prior mineral leases they had granted. Nevertheless, the record reflects that all concerned knew that Keahey's intent was to acquire the wells and the working interests resulting from the expired leases.
The drafts issued to both the Elliotts and the Huckabays state that payment is contingent on approval of title within ten days from the date the drafts were received by Keahey's Texas bank.
Keahey filed the mineral and royalty deeds on October 23 (Elliott) and 25 (Huckabay). Elliott testified that after he first submitted his draft for payment on October 23, Keahey contacted him to warn him that the draft would be returned unpaid due to a "paperwork" problem; Keahey asked Elliott to resubmit the draft, which would be paid at the same time as the Huckabays' draft. Elliott resubmitted the draft on November 9; it was again returned unpaid on November 21. The Huckabays' draft was returned unpaid on November 13. The Huckabays and the Elliotts filed separate suits, on November 28 and December 7, respectively.
Keahey testified that at some point prior to his refusal to honor the drafts, he learned of two oil and gas liens filed against the wells in February and March 1989. Bayou Exploration then refused to sign a release in his favor. Keahey had found no current operator's reports on the wells; these were filed belatedly in November 1989. Moreover, the instruments whereby Bayou acquired the leases, dated March 1987, were not filed until April 1990, along with Bayou's assignment of the leases to Entergrated Energy Producers, Inc. Based on the presence of the liens, and the problems regarding the leases, Keahey declined to pay the drafts.
In January 1990, Keahey executed and filed reconveyance deeds in favor of the plaintiffs, reciting that they were unable to deliver a "merchantable title." The parties stipulated that neither the Elliotts nor the Huckabays were consulted or involved in the reconveyances.
The consolidated cases were tried September 25, 1990. Judgments were rendered January 17, 1991 ordering Keahey to honor the drafts and pay attorney fees, and annulling the reconveyances. Keahey now appeals.

DISCUSSION
Keahey argues in his first assignment that he was justified in refusing to honor the drafts first because of Bayou's apparent contention that its leases had not expired, as evidenced by its belated filing of operating reports and its refusal to sign a release, and also by the fact that Bayou's record title was itself unclear at the time the drafts were submitted for payment. In his second assignment, Keahey urges that any revenue he might have produced by operating the wells would have gone to satisfy the oil and gas liens filed against *100 the wells; the existence of these liens, he argues, further justified his refusal to honor the drafts.
It is undisputed that Keahey intended to acquire the equipment and working interests of the two wells. Nevertheless, plaintiffs argue that Keahey implicitly "accepted title" to the mineral interests conveyed in the deeds, and thus fulfilled the condition stated on his drafts, by filing the deeds in the public records. See La.C.C. art. 1927; Reed v. Flame Petroleum, Inc., 469 So.2d 1217 (La.App. 1st Cir.1985). We need not decide, however, if Keahey's conduct constituted implied acceptance of title. Even if Keahey had actually accepted title and completed the transactions, he could claim the protection of the warranty laws which provide a "continuing guarantee to the buyer by the seller-warrantor" to maintain the buyer in "peaceable possession of the property." Dillon v. Morgan, 362 So.2d 1130, 1132 (La.App. 2d Cir.1978); La. C.C. arts. 2476, 2500 et seq.
A vendor of mineral interests, like a vendor of immovable property, is obligated to warrant merchantable title. La.R.S. 31:2, 16, 18; C.C. arts. 2500 et seq.; Toler v. Pacific Intern. Petroleum, Inc., 465 So.2d 925 (La.App. 2d Cir.), writ denied 468 So.2d 1210 (1985). Civil Code article 2501 provides that a vendor warrants his purchaser against "eviction suffered by him from the totality or part of the thing sold, and against the charges claimed on such thing," which were not declared in the sale. Eviction is the loss suffered by the buyer occasioned by the right or claims of a third person. C.C. art. 2500.
The parties may expressly agree to modify or exclude the vendor's warranty. C.C. art. 2503. However, the only such proviso in the instant deeds is the Huckabays' exclusion of warranty as to the equipment located at their well site. Thus, as to the mineral interests conveyed, the deeds were "warranty deeds."
It is clear that the lessee's claims and the presence of liens would interfere with Keahey's ability to garner the net profits from any production from the wells. Thus, had Keahey honored the drafts and attempted to re-work and produce the wells, he would have suffered an eviction from the enjoyment of the thing he had purchased.
Generally, cancellation of the sale, with return of the purchase price, is among an evicted buyer's remedies; even where the buyer is only partially evicted, he may still have the sale cancelled if he would not have made the purchase without the part from which he has been evicted. C.C. arts. 2506, 2511, 2514; Collins v. Slocum, 317 So.2d 672 (La.App. 3d Cir.1975); see also Richmond v. Zapata Development Corp., 350 So.2d 875 (La.1977). However, a buyer has no warranty action against his vendor where the charge complained of is an apparent servitude. C.C. art. 2515; Richmond v. Zapata, supra, and citations therein. In Richmond v. Zapata, the Supreme Court concluded that a mineral lease which manifests on the property ample signs of its existence will not form the basis of an action in warranty against the vendor of the property. Relying on Richmond, the trial court in this case concluded that Keahey was obligated to pay the drafts because the factors influencing his decision not to honor the drafts were "clearly apparent" before he made his proposal to the plaintiffs. We are not convinced, however, that Richmond, a warranty action brought by the buyer of immovable property burdened with a mineral lease, supports the conclusion that a buyer of mineral rights, under the circumstances presented here, is denied an action in warranty where there were no "clearly apparent" signs of current mineral production. Keahey obviously knew there had been leases on the wells but reasonably believed they had expired; it was his expressed intention to use the equipment left by the lessee. The fact that Bayou's signs remained at the seemingly abandoned well sites seems to be inconclusive "visual" evidence that the leases had not expired, particularly since the operating reports on the wells were more than 90 days old. Nevertheless, we find that we need not decide the issue raised in Keahey's first assignment, *101 as we conclude that the case is resolved by the claim raised in his second assignment.
By that assignment, Keahey claims he dishonored the drafts because of outstanding liens affecting the equipment, minerals and proceeds of the wells. See La.R.S. 9:4861. These "charges" certainly did not manifest "visible external effects on the property[.]" Richmond v. Zapata, 350 So.2d at 880. Thus, contrary to the trial court's finding, one of the factors which influenced Keahey to dishonor the drafts was not "clearly apparent."
Ordinarily, a purchaser who seeks to avoid the sale because of an undeclared encumbrance on the property has the right only to withhold from the purchase price an amount sufficient to discharge that encumbrance. Toler v. Pacific Intern., supra, and authorities therein. This rule obviously contemplates a situation where the amount of the encumbrance is less than the purchase price. Here, however, the liens totalled more than twice the contemplated purchase price when Keahey completed his title examination in November 1989. Even though the smaller of the two liens, totalling $7,804.92, was cancelled prior to trial in April 1990, the remaining lien was $34,-909.10, nearly $15,000 more than the total cash purchase price of $20,000. Liens of this comparative magnitude, undeclared by the seller, are clearly among the "charges" contemplated by the warranty laws. See Roth v. B & L Enterprises, Inc., 420 So.2d 1094 (La.1982); Phillips v. Weichert, 141 So. 476 (La.App. 2d Cir.1932).
The trial court found that Keahey had examined the records and knew of the leases before opening negotiations; this is not plainly wrong. Keahey testified, however, that he examined the conveyance records prior to approaching the plaintiffs only to obtain a description of the property. There is no evidence that he examined title to the property until after the deeds were executed.
Keahey stated that he learned of the liens prior to dishonoring the drafts. Even if Keahey should have known of the liens from his perusal of the records, his knowledge would not deny him an action in warranty for restitution of the price; any knowledge of the liens on his part would simply preclude his collecting damages for the potential eviction caused by the existence of the liens. Roth, supra; Richmond, supra.
Keahey would have been entitled to restitution of the purchase price if he had already tendered it; his discovery of this defect before he paid the price gave him the right to seek judicial cancellation of the sale. Collins, supra. Instead of following this course, Keahey withheld payment and reconveyed the mineral interests to the plaintiffs. Strictly speaking, Keahey did not file a warranty action against the plaintiffs; however, he raised breach of warranty as a defense to their suit to collect the purchase price. Thus the issue was before the court as effectively as if he had filed a warranty action, and the plaintiffs were well aware of this fact. Even with the issue thus framed, however, the plaintiffs made no attempt to show that the larger of the two liens had been cancelled or had prescribed.
The plaintiffs' deeds contained implied warranties against eviction occasioned by a right or charge of a third person. C.C. arts. 2500, 2501. The presence of liens affecting the equipment and working interest in the wells constituted undisclosed charges on the minerals conveyed. C.C. art. 2515; Toler, supra. These charges were of sufficient magnitude as to make a prima facie case that Keahey could rescind the sale. Toler, supra. The plaintiffs did not rebut this showing even though the issue was squarely before them.
We do not approve of Keahey's self-help of filing unilateral reconveyances to achieve the judicial remedy contemplated by the Civil Code. However, because of the unique sequence of facts here presented, Keahey cannot now sue to rescind his purchase of mineral rights which were already transferred back to the plaintiffs. In light of the record facts and procedural posture, and in the interest of judicial economy, the "just, legal, and proper" remedy is to consider the initial sales of mineral rights rescinded and the parties restored to *102 the status quo ante. La.C.C.P. art. 2164; Collins, supra. For these reasons, the judgments will be reversed and rendered.

CONCLUSION
The judgments ordering Keahey to honor the drafts and pay attorney fees are reversed. Judgment is rendered declaring null and void the following documents in the conveyance records of Red River Parish:
Referring to the Huckabay site, described in footnote 1 of this opinion:
1) Instrument # 173,258 of record in Conveyance Book 242, Page 542, dated October 25, 1989;
2) Instrument # 173,259 of record in Conveyance Book 242, Page 544, dated October 25, 1989;
3) Instrument # 173,760 of record in Conveyance Book 244, Page 489, dated January 18, 1990.
Referring to the Elliott site, described in footnote 2 of this opinion:
4) Instrument # 173,231 of record in Conveyance Book 242, Page 516, dated October 23, 1989;
5) Instrument # 173,232 of record in Conveyance Book 242, Page 518, dated October 23, 1989;
6) Instrument # 173,759 of record in Conveyance Book 244, Page 487, dated January 18, 1990.
Costs in the trial court are assessed one-half against plaintiffs, one-half against defendant. Costs of this appeal are assessed against plaintiffs.
REVERSED AND RENDERED.

APPLICATION FOR REHEARING
Before MARVIN, NORRIS, LINDSAY, VICTORY and BROWN, JJ.
Rehearing Denied.
NOTES
[1] The mineral deed describes the Huckabay property as follows:

All of the oil, gas and other minerals underlying the Southwest Quarter of the Northeast Quarter of the Southeast Quarter, containing 10 acres, more or less, and the West three (3) acres of the Southeast Quarter of the Northeast Quarter of the Southeast Quarter, all in Section 1, Township 13 North, Range 9 West, Red River Parish, Louisiana, being 13 acres, more or less[.]
[2] The mineral deed describes the Elliott property as follows:

All of the oil, gas and other minerals underlying the East 8.0 acres of the Northeast Quarter of the Southwest Quarter and all that part of the Northwest Quarter of the Southeast Quarter lying West of Louisiana State Highway # 507, LESS AND EXCEPT the South 429.00 feet thereof, all in Section 6, Township 13 North, Range 8 West, Red River Parish, Louisiana, being 21 acres, more or less[.]